FARMERS STATE BANK of Conception Junction, Missouri, Appellant, v. RICHARD KUCHS et al., Respondents.

Kansas City Court of Appeals, May 13, 1912.

1. CORPORATIONS, PRIVATE: Stockholders: Liable as Copartners. When a number of persons associate themselves together, intending to incorporate, and omit to take the necessary steps to perfect the corporate organization, and proceed to do business and contract obligations in the name of such intended corporation, they will be held to be copartners with respect to such obligations.

2. ———: Incorporators: Authority of Agent. That an attempt was made to incorporate and one of the incorporators without authority assumed to act as agent of the corporation and contracted debts in its name, does not, of themselves, make the innocent projectors liable for the payment of such debts as copartners.

Appeal from Nodaway Circuit Court.—*Hon. William C. Ellison*, Judge.

AFFIRMED.

*Perry & Dalby* and *Cook, Cummins & Dawson* for appellant.

*W. W. Ramsey, B. R. Martin* and *Shinabargar, Blagg & Ellison* for respondents.

JOHNSON, J.—This is a suit on three promissory notes prosecuted by plaintiff against Richard Kuchs, H. E. Ralston, P. J. Lahr, Alice M. Lahr, C. A. Jensen and T. H. Roseler, who, it is alleged, were partners doing business under the firm name of the "Conception Creamery Company." Two of the notes, one for $1000 and the other for $500 were executed January 25, 1908; the remaining note which was for $1000 was executed June 15, 1908. All of the notes bore the signature "Conception Creamery Co.," by H. E. Ralston. One bore the individual signatures of H. E. Ralston and Theo. Roseler; the other two, i. e., one for $1000 and the other for $500, were signed by H. E. Ralston and also by his brother E. H. Ralston. None of the notes was signed by defendants Kuchs, Lahr, Mrs. Lahr or Jensen. E. H. Ralston was president of the plaintiff bank at the time the suit was instituted and was not made a party to the suit. The notes were given for money borrowed of plaintiff by H. E. Ralston who was manager of a creamery at Conception and borrowed the money for use in that business. The defendants H. E. Ralston and Roseler filed no answer to the petition but plaintiff dismissed them from the action and proceeded against the remaining defendants Kuchs, Jensen and the two Lahrs. These defendants filed an answer, duly verified, denying the partnership and interposing the defense of *non est*

*factum.* A jury was waived and after hearing the evidence the court rendered judgment for the defendants. Plaintiff appealed.

The facts of the case are as follows: A creamery was established at Conception Junction by money contributed by farmers who formed themselves into an unincorporated association. H. E. Ralston and P. J. Lahr were the promoters of the organization and were placed in control of the business, Ralston being the manager. We infer the business had insufficient capital and after operating it sometime, Ralston promoted a new company to take over the business. He went to defendant Kuchs, a man of means living in Maryville, and told him of his purpose to organize a corporation with a capital stock of $15,000 divided into shares of $100 each to acquire the creamery plant and business and asked him to become one of the incorporators. Further he asked that Kuchs subscribe for twenty-five shares of the stock on the agreement that Ralston would take all but one of the shares as soon as the incorporation was completed. Kuchs consented. A similar request with a similar promise was made of Jensen who accepted and articles of incorporation were prepared, signed and acknowledged at Maryville. The incorporators and shares subscribed by each were as follows:

| | |
|---|---|
| H. E. Ralston | 48 shares |
| P. J. Lahr | 20 shares |
| Alice M. Lahr | 30 shares |
| Richard Kuchs | 25 shares |
| C. A. Jensen | 25 shares |
| T. H. Roseler | 2 shares |

Ralston explained that the forty-eight shares subscribed by him represented not only his own interest in the creamery but the interests of the farmers who had furnished the capital. It appears P. J. Lahr subscribed thirty shares for his wife Alice and signed her

name to the articles without her knowledge or consent. Mrs. Lahr did not attend the stockholders' meeting subsequently held at the creamery and in no manner became a party to the new organization.

The articles stated that the capital stock was fully paid but that statement was not true. No money was paid in, and the organization never got beyond the paper stage. The articles stated that one of the purposes of the corporation was "to acquire the business now carried on by P. J. Lahr and H. E. Ralston in Conception Junction, Missouri, with the buildings, plant, stock, and other properties connected therewith and also the good will of said business."

These articles were filed in the office of the recorder of deeds at Maryville but were not sent to the Secretary of State nor was any attempt made to procure a charter. Immediately after signing the articles at Maryville, the "incorporators" went to the creamery and held a stockholders' meeting. Kuchs was elected president and H. E. Ralston manager of the business. A stock book was procured, stock was issued to the incorporators and Kuchs and Jensen each transferred twenty-four shares to Ralston. At the close of the stockholders' meeting, of which, by the way, no notice was given to Mrs. Lahr nor was she present at the meeting, the stockholders went into the business office and told the bookkeeper that a new company had been formed to run the business, that Kuchs was president, and that Ralston would continue in the management. No formal transfer of the business was made to the so-called corporation, no change of name was made, nor was there any change in the method of doing business except, perhaps, in the manner of signing checks. No change was made in the bank account and it does not appear that the farmers who were the real owners of the plant and business consented or even knew of the proposed change of ownership. And further, it does

163 App.—39

not appear that Ralston and Lahr had any authority to sell the business to a new corporation or to subscribe for shares in such corporation on behalf of the farmers.

The bookkeeper who was called as a witness by plaintiff testified that about a year after the abortive corporation was formed to take over the business the farmers came in "to see if they had any interest in that creamery. Mr. Ralston called them in. They were wanting to know if they had any say, or had any dividend coming or if they were considered in the matter. There must have been about forty of them there that day—forty or fifty. They met down at the creamery but they were out where the vats and churn part was. Mr. Ralston was out there with them, but I was not in that part. I knew they were out there. He done the talking, the rest of them didn't."

Mr. Ralston did not appear at the trial though he was living at Maryville and was subpoenaed but from the testimony we have just quoted, as well as from other facts and circumstances in evidence, it is plain the farmers did not know of any change in the business nor that Ralston had assumed the right to represent them in the new corporation. We have said that none of the incorporators paid any money for their stock and it is quite clear that Ralston's scheme did not contemplate that any money for the business would be obtained by payments on stock subscriptions. The two new solvent members, Kuchs and Jensen were not to pay anything. The question naturally suggests itself, What did Ralston, who was something of a lawyer and more of a promoter, expect to gain for the business by making a pretense of organizing a corporation without completing the incorporation and without procuring a dollar from the incorporators? The answer will appear in the narration of subsequent events. In January, 1908, Ralston on behalf of the pretended incorporation borrowed $1500 from plain-

tiff on two of the notes in suit, both of which were
signed by E. H. Ralston as surety. E. H. Ralston who
is solvent testified that he is the brother of H. E. Ral-
ston and to accommodate his brother signed the notes
on the following representation:

"He told me that they had a $15,000 incorpora-
tion—some of them had not paid in; that they were
good, in his opinion, and he was building, and had com-
pleted an ice house a cooler just joining the north
side of the creamery building. He said the institu-
tion was a corporation, they had completed an ice
house sometime before. This note was given to the
bank for borrowed money. The first thousand dol-
lar one—part to the Lumber company and part to the
man who manufactured the cement blocks and sold
cement—T. W. Costello. It was my understanding
that it was for the construction of that ice house. I
was not living in Conception at that time. As to this
five hundred dollar note, he told me that that was to
take up some overdraft they had at the bank, and give
him some credit to go on, and buy commodities—
cream."

In March, 1908, E. H. Ralston became a stock-
holder in plaintiff bank and afterwards was elected
president of that institution. In June, 1908, as pres-
ident of the bank he loaned the creamery company
$1000 more and this time he did not sign the note he
took to evidence that loan. The creamery failed ow-
ing $2500 to plaintiff, procured in the manner de-
scribed, and the real object of the present suit, which
is prosecuted by E. H. Ralston, as president of the
bank, is to recover the amount due on the notes from
Kuchs and Jensen who are solvent.

The theory on which these two men, who inno-
cently and foolishly allowed themselves to be en-
trapped in the meshes of fraud cunningly woven by
H. E. Ralston, is that the incorporators of the pre-
tended but invalid corporation are liable as partners

for the debts of the business they acquired and op-
erated in the name of an apocryphal corporation. The
rule is well settled that if an association which is
intended to be incorporated omits to take a neces-
sary step to perfect its organization as a corporation,
the members will be liable for its debts as copartners.
[Hunt v. Salisbury, 55 Mo. 310; Martin v. Fewell, 79
Mo. 401; Richardson v. Pitts, 71 Mo. 128; Sexton v.
Snyder, 119 Mo. App. 668.] The rule thus is stated
in the case last cited: "It is well settled in this state
that when a number of persons associate themselves
together, intending to incorporate, and omit to take
the necessary steps to perfect the corporate organi-
zation, and they proceed to do business and contract
obligations under and in the name and style of such
intended corporate name, the law will pronounce those
thus acting together as copartners, with respect to
such persons with whom they have dealt, under the
circumstances stated, and they are to be held to the
responsibilities as to such persons, of copartners."

But the mere facts that an abortive attempt to
incorporate was made and that one of the incorpora-
tors without authority, express or implied, assumed
the right to act as the agent of the corporation, and
as such agent, contracted debts in the name of the cor-
poration, of themselves, are not sufficient to impose
a liability for the payment of such debts upon the in-
nocent projectors. [The Railroad Gazette v. Wherry,
58 Mo. App. 423.]

A liability of the character sought to be enforced
by plaintiff must be supported by some element of
estoppel. That is to say that the burden was on the
plaintiff to show that defendants by act or word gave
Ralston either express or implied authority to as-
sume control of the creamery in the name of the pro-
posed corporation and to enter into contracts in its
name. The record contains no evidence of this charac-
ter but on the contrary, all the evidence is to the effect

that Ralston acted entirely on his own initiative and without any authority from defendants when for the purposes of obtaining money from plaintiff he falsely and fraudulently represented that the creamery was being operated by a legal corporation and exhibited the articles signed and acknowledged by defendants and filed with the recorder of deeds to verify his representations. It is true a stockholders' meeting was, held, officers were elected, and it was decided that the corporation when it became a legal entity should acquire the creamery and operate it. But the evidence shows that defendants and the other incorporators understood that the corporation could not become an entity without a charter from the state and it was understood and, in effect, agreed that its activities should not begin before it became a legal being. Ralston was attending to the business of incorporating the company and defendants who lived in another town did not know that for a fraudulent purpose he had failed to procure a certificate of incorporation from the Secretary of State and, assuming to act as the manager of a corporation that had no legal existence, had borrowed money in its name. Ralston kept his sins of omission and commission from them and by conducting the business in the same name and manner as before, gave no visible sign of his manipulations. That he had no actual authority, express or implied, from defendants to contract debts on behalf of the pretended corporation is manifest and we do not think it can be said that defendants clothed him with apparent authority. True they signed and acknowledged articles of association but that is only one step in the process of creating a corporate entity. The infant is not born until it comes to light and the legal evidence of its birth is the certificate of incorporation. If plaintiff and E. H. Ralston, who appears to have been the person who really extended the credit, relied on the mere oral representations of H. E. Ralston,

they were the victims of his duplicity and if they relied in whole or in part on the articles of incorporation he exhibited, they were unbusinesslike to the point of negligence in giving greater credence to that instrument than it warranted. In neither event can plaintiff say it was deceived to its cost by any act of defendants.

And, further, it is very clear that Ralston did not take charge of the creamery and its business as the agent of the pretended corporation for the reason that as the manager of the unincorporated association of farmers who owned the business he had no authority to sell or transfer the business and its assets. Such authority was not within the apparent scope of his duties as manager and plaintiff has not attempted to show he had actual authority to put his principals out of business. His double dealing is established beyond dispute. By making no change in the business he was enabled to continue in his position as the manager of the unincorporated association and by making secret use of the articles of incorporation he was able to obtain money on the theory that he was manager of the business for a corporation. These considerations impel us to say that the evidence even in its aspect most favorable to plaintiff shows that plaintiff was induced to part with its money by the fraudulent practices of Ralston and not by any conduct of defendants from which an implied authority to Ralston to represent them could be inferred.

In this view of the case we do not deem it necessary to speak of questions of practice and of evidence argued in the briefs. Plaintiff's evidence fails to support the contention that constructively defendants were copartners of Ralston and the court did not err in giving a declaration of law that was the equivalent of a demurrer to plaintiff's evidence.

The judgment is affirmed. All concur.